IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL GILBREATH,

                              Petitioner,                    OPINION and ORDER

       v.
                                                             19-cv-728-jdp
DAN WINKLESKI,

                              Respondent.

Petitioner Michael Gilbreath was charged with repeated first-degree sexual assault of a child over a four-year period. There were no third-party witnesses to the assaults and no physical evidence. Instead, the state's case depended almost entirely on the testimony of the victim, S.L., Gilbreath's step-granddaughter.

A jury convicted Gilbreath, and the state court sentenced him to 10 years in prison, to be followed by 15 years of extended supervision. After exhausting his remedies in state court, Gilbreath, who is represented by counsel, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this court. The petition is fully briefed and ready for a decision. Gilbreath contends that his conviction should be vacated because his trial counsel was ineffective for failing to introduce evidence that would have undermined S.L.'s credibility and bolstered Gilbreath's defense.

Federal courts can grant relief to prisoners challenging a state conviction, but only in narrow circumstances. 28 U.S.C. § 2254(d). In light of the deference a federal court must give both trial counsel and the state court, it is a rare case in which a federal court may grant a habeas petition in the context of a claim for ineffective assistance of counsel. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). But this is one such case.

Witness credibility was the key issue at Gilbreath's trial, and his counsel's failure to present evidence that would have undermined S.L.'s credibility and bolstered Gilbreath's defense deprived Gilbreath of a fair trial. The Wisconsin Court of Appeals unreasonably concluded that the failure to present the credibility evidence was a matter of reasonable trial strategy and that the evidence was merely cumulative. Gilbreath is entitled to habeas relief.

This does not mean that Gilbreath is innocent of the crimes of which he is accused or that S.L. should not be believed. I conclude only that Gilbreath's counsel was ineffective and that the state appellate court's decision affirming his conviction was unreasonable. The state retains the right to retry Gilbreath for the serious crimes alleged against him.

BACKGROUND

The following facts are taken from the petition and the state court records provided by Gilbreath and the state.

**A.  Trial and sentencing**

In Adams County Case No. 2012CF01, Gilbreath was charged with repeated first-degree sexual assault of a child over a four-year period. The child was Gilbreath's step-granddaughter, S.L. The sexual assaults were alleged to have taken place at Gilbreath's house, where S.L. also lived, between 2002 and 2006, when S.L. was between nine and 12 years old. S.L. first disclosed the assaults to law enforcement in January 2008, shortly before Gilbreath was to be released from prison after serving a sentence for drunk driving. In 2008, S.L. reported that the assaults had occurred five or six times. Dkt. 7-1. In June 2010, S.L. disclosed the assaults again, this time stating that the assaults had occurred approximately two to three times a week for at least four years. *Id.*

Gilbreath pleaded not guilty to the charge and the case proceeded to a three-day jury trial in May 2014. Gilbreath was represented by Attorney Christopher Van Wagner. The state called four witnesses: S.L.; Patricia Gilbreath (Gilbreath's wife and S.L.'s grandmother); Haiden Gilbreath (Gilbreath's daughter and S.L.'s aunt); and Ann McKinley, a consultant from Wisconsin Coalition against Sexual Assault. Gilbreath was the only witness who testified during the defense's case.

### 1. Ann McKinley's testimony

The state's first witness was Ann McKinley, a consultant from Wisconsin Coalition against Sexual Assault. McKinley was called as an expert witness. McKinley testified that it is common for sexual assault victims, and child victims in particular, to delay reporting sexual assaults. Dkt. 6-10, at 64. Victims might feel like they do not have a trusted caregiver, might have mixed feelings about the offender, and might be worried about reprisal. *Id.* McKinley testified that it is common for victims of child sexual assault to provide inconsistent accounts of the sexual assaults because they have difficulty remembering details and distinguishing between multiple assaults. *Id.* at 90. McKinley also testified that victims of abuse may resort to negative coping behaviors. *Id.* at 66.

### 2. S.L.'s testimony

S.L. testified next. She was 20 years old, married, and had a child at the time of trial. She testified that she was raised by her grandparents, Michael and Patricia Gilbreath, in a small house with three other children: Giovanni, S.L.'s half-brother, who was two years younger than S.L.; Haiden, the Gilbreaths' daughter, who was the same age as S.L.; and Aaron, the Gilbreaths' son, who was four years older than S.L. Dkt. 6-10, at 94–95. Gilbreath and Patricia shared a bedroom, though Patricia usually slept on the couch in the living room. The four

3

children shared the other bedroom in the house until approximately 2004, when the family turned the garage into a bedroom. *Id.* at 98–99. Aaron and Giovanni moved into the garage-room, and S.L. and Haiden remained in their room. *Id.* S.L. and Haiden shared a futon bed, which was smaller than a queen-size bed. *Id.* at 104.

S.L. testified that Gilbreath was an alcoholic who came home drunk multiple nights a week. *Id.* at 100–01. On several occasions, Gilbreath came into S.L. and Haiden's bedroom around 2:00 or 3:00 in the morning and sexually assaulted S.L. by kissing her and touching her breasts and vagina. *Id.* at 103. S.L. testified that Haiden was present when the assaults occurred. *Id.* at 103–04. Gilbreath would climb on the bed and lay between S.L. and Haiden when molesting S.L. *Id.* at 108–09. S.L. testified that she would pretend to be asleep, but that Gilbreath would force her mouth open so that he could kiss her. *Id.* at 105-06. S.L. testified that the assaults happened both over and under her clothes, and she stated that she did not know how many times Gilbreath assaulted her because it happened so frequently, for a period of several months. *Id.* at 107, 110.

S.L. stated that the bedroom door was open during the sexual assaults, and that Patricia slept on the couch in the living room about eight to ten feet away, where she could see into the girls' room. *Id.* at 119; Dkt. 6-11, at 30. Patricia was usually awake when Gilbreath came home from bars and went into the girls' room. Dkt. 6-10, at 119. Patricia would often ask Gilbreath why it was taking so long to say good night to the girls and would tell him to hurry up. *Id.* at 120.

S.L. also testified about three specific sexual assault incidents. In one incident, S.L. described Gilbreath putting petroleum jelly on his penis and S.L.'s hand, climbing into her bed, and using her hand to rub his penis. *Id.* at 112–14. The second incident involved Gilbreath

4

undressing S.L. and himself and putting S.L. on top of his penis in the bathtub. *Id.* at 114–15. The third incident occurred in Gilbreath's bedroom. S.L. testified that Gilbreath asked both S.L. and Haiden to sleep in his bed, and then he touched S.L.'s vagina and breasts. *Id.* at 116–18.

S.L. testified that she told her older cousin, Kayla Faulds, about the sexual assaults when they were happening, and that Kayla responded that it was gross, that she could not believe Gilbreath would do something like that, and that she was not going to go near Gilbreath again. *Id.* at 121. S.L. also testified that she told her uncle Aaron, Gilbreath's son, that Gilbreath was touching her inappropriately, and that Aaron responded that if Gilbreath touched her again, S.L. should tell Aaron and he would do something about it. *Id.* at 122.

The abuse stopped in 2006, when Gilbreath was incarcerated for drunk driving. *Id.* at 129. In 2008, S.L. decided to disclose the assaults after a friend encouraged her to do so. *Id.* at 126. She was 14 years old at the time. She testified that the reason she disclosed the assaults was because Gilbreath was going to be released from prison soon and she was worried that he would start abusing her again. *Id.* at 129. S.L. testified that after she disclosed the assaults, social services instructed her to stay away from Gilbreath and to avoid him as much possible when he came home from prison. *Id.* at 130. (The trial judge later read to the jury a stipulation between the parties stating that when S.L. disclosed the abuse in 2008, she told the social worker that the touching had occurred five or six times. Dkt. 6-13, at 6.)

S.L. disclosed the assaults to a social worker again in 2010. S.L. testified that she did so because she was concerned about Gilbreath's behavior. She stated that in 2010, he yelled at her frequently, called her names, told her that she was just like her mom, and tore up her temporary driver's license. Dkt. 6-10, at 133–36. Gilbreath also talked about sex in front of

S.L. and the other children. *Id.* at 134. S.L. testified that she had started cutting and burning herself to cope with her anxiety and to make herself unattractive to Gilbreath. *Id.* at 140–41. After S.L. talked with a social worker and law enforcement, Gilbreath and Patricia were angry. *Id.* at 138. The family disowned S.L. and refused to talk to her, and S.L. was moved to foster care. *Id.* at 139.

On cross-examination, defense counsel attempted to undermine S.L.'s credibility in a number of ways. Counsel asked S.L. about a letter that she had written to a psychological counselor describing the assaults in ways inconsistent with S.L.'s testimony. Dkt. 6-11, at 31–41. S.L. admitted initially that she had written the letter, but then admitted that several statements in the letter were false. *Id.* S.L. then said that she did not remember writing the false statements, and she later denied writing the statements at all, stating that she did not know how the false statements got into the letter. *Id.* On redirect, S.L. testified that the letter was intended to be an emotional outlet, not a "factual account." *Id.* at 60, 65.

Defense counsel also asked S.L. about letters that she had purportedly written to Gilbreath while he was imprisoned for drunk driving. The letters expressed affection for Gilbreath and stated that S.L. looked forward to him coming home. *Id.* at 8–11. S.L. testified that she did not remember writing any letters to Gilbreath while he was in prison. *Id.* On redirect, S.L. testified that the handwriting in the letters was not hers, that she had "no idea" who wrote the letters, and that she was sure that she did not write them. *Id.* at 67–68.

Defense counsel also attempted to establish that S.L. was motivated to make up the assault because Gilbreath was a harsh disciplinarian who restricted her access to dating and driving, and because S.L. was having behavioral problems leading up to the second disclosure in 2010. *Id.* at 45–47. But S.L. denied going through a "wild" or "bad" phase while Gilbreath

was incarcerated, denied that she was getting into trouble, and denied that Gilbreath had any problem with her boyfriend. *Id.* at 44, 45, 50.

### 3. Patricia Gilbreath's and Haiden Gilbreath's testimony

The state called Patricia and Haiden Gilbreath as witnesses. Haiden described her dad as mean and drunk a lot when she was young. Dkt. 6-12, at 78. She stated that she was not very close to him as a child. Haiden testified that she heard Gilbreath call S.L. a "bitch," that Gilbreath had "no filter," and that he had inappropriate sexual conversations in front of his kids. *Id.* at 1, 8. Haiden acknowledged that Gilbreath occasionally came into her and S.L.'s bedroom late at night to hug them and say goodnight. *Id.* at 5.

The state questioned Haiden about statements that she gave to a social worker in 2008, after S.L.'s first disclosure of the assaults. According to a social worker's report, Haiden had stated that Gilbreath once kissed her "more like a boyfriend," and that Haiden had stated, in response to questions about S.L., that Haiden was "the lucky one." *Id.* at 8. Haiden testified that she did not remember making those statements. She also testified that Gilbreath never climbed into bed between her and S.L. and that she never saw Gilbreath touch S.L. inappropriately. *Id.* at 15. On cross-examination, Haiden testified that S.L. got into trouble in high school, but Haiden did not provide any details. *Id.* at 82.

Patricia Gilbreath testified that she slept right outside S.L. and Haiden's bedroom door. *Id.* at 40. She recalled Gilbreath going into the girls' bedroom at night, but she stated that Gilbreath sat on the floor. *Id.* at 40, 59. She testified that although she did not watch Gilbreath the whole time that he was in the girls' bedroom, she did not think she fell asleep while he was in the room because she is light sleeper. *Id.* at 59–60. Patricia stated that after S.L. disclosed the assaults in 2008, she put a lock on the girls' bedroom door as directed by social services.

*Id.* at 38. Patricia testified that she was "done" with S.L. after S.L. disclosed the assaults again in 2010. *Id.* at 50.

Haiden and Patricia both testified that S.L. wrote letters to Gilbreath while he was in prison, and that the handwriting on the letters shown at trial was S.L.'s handwriting. *Id.* at 20–24, 53–54. Patricia also testified vaguely about S.L. having problems following rules and always wanting to stay with her boyfriend. *Id.* at 48–49. Defense counsel did not cross-examine Patricia.

### 4. Gilbreath's testimony

Gilbreath was the only witness called by the defense. He testified that he started drinking when he was 14 years old and that he'd had eight convictions for drunk driving. Dkt. 6-13, at 36. When his children were younger, he stayed out late at bars several times a month. Everybody living in his house knew when he came home, because his motorcycle was loud, the family had four or five dogs that would start barking, and he walked right past the living room couch where his wife was sleeping. *Id.* at 87. He sometimes went to his sons' and daughters' rooms to say good night, smoke a cigarette, and drink a glass of water. *Id.* at 84. Gilbreath denied sexually abusing S.L., denied getting into S.L. and Haiden's bed with them, and stated that he would not have been able to fit into their small double bed, as he is six feet tall and 200 pounds. *Id.* at 87. He testified that he was shocked when he first heard that S.L. had accused him of sexually abusing her. *Id.* at 71. He testified that after he came home from prison in 2008, S.L. lied constantly and refused to abide by house rules. *Id.* at 98. Gilbreath attempted to discipline S.L. and to place restrictions on the time she spent with her boyfriend, but nothing worked, so Gilbreath cut up her temporary driver's license. *Id.* at 100. Shortly after that, Gilbreth was arrested based on S.L.'s second disclosure of the sexual abuse. *Id.* at 104.

### 5.  Closing statements

Defense counsel's strategy was to question S.L.'s credibility, and to suggest possible motives as to why she would fabricate the sexual assaults. Counsel pointed out that S.L had made inconsistent statements to various people when describing the nature and extent of the sexual assaults. Counsel argued that the assaults could not have happened without someone else knowing, considering that six people lived in the small house. Counsel also argued that S.L. was motivated to falsely accuse Gilbreath because he was a verbally abusive alcoholic, a disciplinarian, and he had interfered with S.L.'s ability to date and drive a car.

The prosecutor argued that Gilbreath was an abusive alcoholic that should not be credited. The prosecutor also argued that Haiden and Patricia knew about the abuse but were lying to protect Gilbreath. The prosecutor pointed out the lack of evidence to support the defense's theory that S.L. had a motive to fabricate the sexual abuse in 2008, and then to disclose the abuse again in 2010.

The jury found Gilbreath guilty of repeated first-degree sexual assault of a child. Gilbreath was sentenced to 10 years of imprisonment to be followed by 15 years of extended supervision.

## B.  Postconviction motion and evidentiary hearing

Gilbreath, through counsel, filed a postconviction motion contending that trial counsel was ineffective by failing to: (1) interview and present evidence from Aaron Gilbreath (Gilbreath's son) and Kayla Faulds (Gilbreath's niece) about whether S.L. disclosed assaults to them; (2) present evidence contradicting S.L.'s denial of behavioral problems and Gilbreath's interference with her dating; (3) present evidence of the inconsistencies between S.L.'s 2008 and 2010 disclosures; (4) present evidence from family members close to S.L. and Gilbreath

who did not see evidence of sexual touching or suspicious conduct; (5) present evidence from family members about S.L.'s dishonesty; and (6) present evidence supporting a motive for S.L. to lie in 2008.

The circuit court held an evidentiary hearing on the motion at which Patricia Gilbreath, Haiden Gilbreath, Aaron Gilbreath, Giovanni Schimke (S.L.'s brother), Kayla Faulds, Dawn Faulds (S.L.'s aunt), Gilbreath, and Christopher Van Wagner (Gilbreath's trial counsel) testified.

### 1. Aaron Gilbreath's testimony

Aaron Gilbreath, who is four years older than S.L., testified that he shared a bedroom with S.L. and Haiden from 2002 to 2004, and that he slept directly above S.L. He testified that he never observed sexual touching or suspicious conduct, and that S.L. never told him that Gilbreath sexually assaulted her. He stated that the first time he heard about the allegations was when Gilbreath was released from prison in 2008. Dkt. 6-15, at 11–15.

Aaron also testified that in 2008, S.L. became romantically involved with Aaron's best friend, who was four years older than 14-year old S.L. Aaron testified that he told Gilbreath about the relationship shortly before Gilbreath's release from prison, and that Gilbreath was unhappy about the relationship. *Id.* at 27-28.

### 2. Kayla Faulds's testimony

Kayla Faulds, Gilbreath's niece and S.L.'s cousin, testified that she had been close to S.L. and Haiden growing up and that she had spent the night at their house at least once a month. *Id.* Kayla testified that she never saw any sexual touching or suspicious conduct, that S.L. never told her that Gilbreath had molested her, that the first time she heard about the allegations was when her mother told her about them around the time that Gilbreath was

released from prison in 2008, and that she thought S.L. had a untruthful character. *Id.* at 132, 137.

### 3. Giovanni Schimke's testimony

Giovanni Schimke, S.L.'s younger brother, testified that he slept in the same room as S.L. from approximately 2002 to 2003, in a bunk bed directly above S.L. *Id.* at 144–146. Giovanni did not observe sexual touching or suspicious conduct. He stated that S.L. was "highly dishonest." *Id.* at 151.

### 4. Dawn Faulds's testimony

Dawn Faulds, S.L.'s aunt and Kayla's mother, testified that she saw S.L. every two to three weekends, and that she stayed in the Gilbreath house when visiting. *Id.* Dawn testified that she saw no sexual touching or suspicious conduct, and that she thought S.L. had an untruthful character.

### 5. Patricia Gilbreath's testimony

Patricia Gilbreath testified about specific problems that S.L. was having around 2010, at the time of her second disclosure of the sexual assaults. Patricia testified that S.L. had been cutting herself and lying about it, and that S.L. had gotten upset when Patricia would not allow her to travel with her boyfriend to New Orleans. *Id.* at 171. Patricia also testified that she had considered putting S.L. into foster care even before S.L. contacted social services the second time, in 2010, because S.L. was doing whatever she wanted, sneaking out, arguing, lying, and not doing her school work. *Id.* at 175–77.

### 6. Michael Gilbreath's testimony

Gilbreath testified at the postconviction hearing that he felt like his attorney was not prepared well for his case before trial. *Id.* at 181. He stated that he had hardly talked to his

11

attorney in depth about his case, and that his attorney did most of the talking and did not respect input from Gilbreath's family. *Id.* at 181, 192. Shortly before trial, his attorney had assured him that the trial would be rescheduled so that they would have more time to prepare, but trial was not rescheduled. *Id.* at 181. Gilbreath testified that he told his attorney that all of his family would be willing to testify, but that his attorney told him he was not going to call family members because they could not prove Gilbreath was innocent. *Id.* at 182.

Gilbreath testified about specific instances in which he and S.L. did not get along, including instances in which he restricted her access to her friends. *Id.* at 187–90. He also testified that he considered placing her in foster care because he did not know how to handle her disobedience, deceit, cutting, and manipulation. *Id.* at 191. He testified that she acted like she was miserable all the time, and that he was angry every day because of her behavior. *Id.* at 195.

### 7.  Trial counsel's testimony

Trial counsel testified that his strategy at trial was multi-faceted. He wanted to show the unbelievability of S.L.'s accusations based on the physical layout of the Gilbreath house and the witnesses who would have seen the sexual assaults. *Id.* at 57. Trial counsel also wanted to show that S.L. had a number of reasons that she wanted to be out of the house and away from Gilbreath. *Id.* And trial counsel wanted to undermine S.L.'s credibility. *Id.* at 59.

Postconviction counsel asked trial counsel about his failure to establish several inconsistencies in S.L.'s prior statements and trial testimony. Trial counsel testified that he did not know why he failed to introduce evidence showing that S.L. had originally reported that Gilbreath touched her only over her clothes or that S.L. had provided no details regarding specific assaults in her 2008 disclosure. *Id.* at 68–69. Trial counsel said he considered

impeaching S.L. with other evidence that would have undermined or contradicted her testimony, but that he did not think it was necessary or that it would be effective. Trial counsel stated that, in his experience, attempting to prove prior inconsistent statements "causes juror's eyes to glaze over and they don't follow it," that he tried to prove one prior inconsistent statement with S.L. and it did not work well, and that he made a "strategic decision" to not prove up additional prior inconsistent statements. *Id.* at 63–65. In addition, it was trial counsel's opinion that his questioning of S.L. regarding the false statements in her letter to her psychologist had completely undermined S.L.'s credibility. Counsel stated that the trial had gone "better than [he] could've ever expected it to go," and that S.L. had "made herself out to be virtually delirious on the stand or incredible." *Id.* at 63. Trial counsel stated that he was "stunned" by the verdict. *Id.* at 66. In addition, trial counsel stated that after Gilbreath's testimony, he did not want to "devolve into further witnesses," such as a social worker, who might have been hostile to the defense. *Id.* at 62.

As for why he did not call Aaron Gilbreath, Giovanni Schimke, Kayla Faulds, or any other family member as a witness, trial counsel testified that he could not recall for sure why he did not call them, except that he did not think they could have offered any testimony that was better than what Haiden Gilbreath would be able to say. *Id.* at 90. Counsel admitted that he did not interview any of these family members about potential testimony that they could offer. *Id.* Counsel testified that he thought Gilbreath did not want Aaron to testify at trial. He testified that, "there was something going on in Aaron's life, and there was some reason why Michael sort of would've preferred I thought that he not be forced to come back here at that time. But I could be wrong about that." *Id.* at 89–91.

13

### 8. Circuit court's decision

The circuit court judge made an oral ruling denying Gilbreath's postconviction motion in its entirety. The judge agreed with Gilbreath that it "wasn't a real strong case," and that he thought that S.L.'s credibility "had been cut to pieces" during cross-examination. Dkt. 6-16, at 26. But the judge concluded that all of the evidence submitted postconviction was cumulative, or "old wine in new bottles." *Id.* at 18. The court stated that trial counsel performed effectively, that all evidence not presented was the result of reasonable trial strategy, and that Gilbreath was not prejudiced. *Id.* at 25–27.

## C. Wisconsin Court of Appeals' decision

The Wisconsin Court of Appeals affirmed the circuit court's denial of Gilbreath's postconviction motion. Dkt. 6-5. The court of appeals concluded that all of the evidence Gilbreath presented postconviction was impeachment evidence of the "same general character" as other impeachment evidence presented at trial, and was therefore cumulative under the Wisconsin Supreme Court's decision in *State v. McAlister*, 2018 WI 34, 380 Wis. 2d 684, 911 N.W.2d 77, which had been decided while Gilbreath's appeal was pending. The court stated:

> S.L.'s credibility was thoroughly impeached at trial and the new impeachment material would be merely cumulative. Therefore, there could be no prejudice to Gilbreath as a result of counsel's alleged deficient performance, because the result of a new trial would be the same.

Dkt. 6-5, at 10.

As for the deficient performance prong, the court of appeals stated in a footnote that counsel's performance was not deficient:

> We also conclude that trial counsel's performance was not deficient. Given the circuit court's observation that trial counsel caused S.L. to "kind of self-destruct," we further conclude that counsel's decision to stop impeachment when he did, and not to

14

call additional witnesses to further impeach S.L. "on the same topic," was a reasonable trial strategy under the circumstances, because trial counsel could reasonably have determined that doing otherwise would have weakened Gilbreath's case. The decision by the post-conviction court has support in the record and is consistent with the presumption of constitutional adequacy that courts are to afford trial counsel's strategic decisions.

*Id.* at 10.

Gilbreath filed a motion for reconsideration, arguing that the court of appeals' definition of "cumulative" evidence was legally erroneous and inapplicable to the case. The court of appeals summarily rejected the motion.

Gilbreath the appealed, and the Wisconsin Supreme Court denied his petition for review. He filed his habeas petition in this court on September 10, 2019.

ANALYSIS

Gilbreath contends that his trial counsel provided ineffective assistance by failing to investigate and present evidence that would have corroborated Gilbreath's testimony, undermined S.L.'s credibility, and provided motive for S.L. to falsely accuse Gilbreath. In particular, Gilbreath argues that counsel should have presented the following evidence to the jury:

- Testimony from Aaron Gilbreath and Kayla Faulds contradicting S.L.'s trial testimony and statements to social workers that she disclosed the molestation to Aaron and Kayla, and that they made statements supporting her;

- Testimony from Aaron Gilbreath and Giovanni Schimke that they shared a bedroom with S.L. during half of the charging period, and slept in an adjacent room during the other half, but never observed any sexual or suspicious behavior;

- Statements from S.L.'s 2008 interview, in which she stated that the touching occurred only over her clothing, in contradiction to her description of the three specific assaults used to support the repeated sexual assault charge;

- Also from S.L.'s 2008 interview, S.L.'s failure to mention the bathtub incident, the hand job incident, or the touching in Gilbreath's bedroom, despite being asked multiple times during the interview for additional details or specifics;

- S.L.'s prior statements to a social worker and police officer describing constantly getting into trouble, contradicting her trial testimony about not having behavioral problems;

- S.L.'s prior statements to a social worker complaining about Gilbreath grounding her and trying to prevent her from seeing her boyfriend, contradicting her trial testimony that Gilbreath did not interfere with her relationships;

- S.L.'s statements to a social worker indicating that Gilbreath did not like her boyfriend because he was a "cutter" and thought that S.L. started cutting herself because of her boyfriend, contradicting S.L.'s testimony that Gilbreath did not know her boyfriend was a cutter;

- Testimony from family members about S.L.'s relationship with an older boy in 2008 of which Gilbreath did not approve, which would have suggested a motive for S.L. to lie in 2008;

- Testimony from family members about S.L.'s behavior problems and dishonesty leading up to the second disclosure in 2010; and

- Opinion testimony from family members about S.L.'s character for untruthfulness.

## A.  Legal standards

Claims for ineffective assistance of counsel are analyzed under the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under the *Strickland* standard, a petitioner must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000). To demonstrate deficient performance, the petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. To demonstrate actual prejudice requires a petitioner to demonstrate "a

16

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Because the Wisconsin Court of Appeals addressed the merits of Gilbreath's ineffective assistance of counsel claims, my review is subject to the deferential standard of review under 28 U.S.C. § 2254(d)(1). Under § 2254(d)(1), Gilbreath is not entitled to relief unless he shows that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." A decision is contrary to clearly established federal law "if the rule the decision applies differs from governing law set forth in Supreme Court cases." *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citations omitted). A decision involves an unreasonable application of Supreme Court precedent "if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case." *Id.*

Alternatively, Gilbreath can obtain relief if he shows that the state court's adjudication of his claims was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). But again, the federal court owes deference to the state court. The underlying state court findings of fact and credibility determinations against a petitioner are presumed correct unless the petitioner comes forth with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013).

To prevail on an ineffective assistance of counsel claim under the deferential standard in § 2254(d), the result is a doubly deferential form of review that asks, "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 89 (2011). This means that only a clear error in applying *Strickland* will

support a writ of habeas corpus. *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009). So long as the Wisconsin Court of Appeals "took the constitutional standard seriously and produced an answer within the range of defensible positions," this court must deny relief. *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (citation omitted).

## B. Deficient performance

Gilbreath argues that it was deficient performance for his trial attorney to fail to present evidence to the jury that would have undermined S.L.'s credibility and presented a more complete explanation of S.L.'s motives to lie. The Wisconsin Court of Appeals rejected this argument in a footnote, stating that defense counsel's failure to call additional witnesses and present additional evidence were reasonable strategic decisions made during trial, after having effectively challenged S.L.'s credibility by impeaching her with the false statements in the letter she wrote to her psychologist. The court of appeals relied on the circuit court's determination that trial counsel could have reasonably determined that presenting additional evidence or witnesses would have been cumulative and could have weakened Gilbreath's case. Dkt. 6-5, at 10, n.5.

I agree with Gilbreath that the court of appeals' analysis of trial counsel's performance was based on an unreasonable determination of the facts and an unreasonable application of federal law. Trial counsel's conduct cannot be explained as reasonable trial strategy. In considering counsel's performance, I have divided the omitted evidence into three categories: uncalled witnesses; prior inconsistent statements; and S.L's motive to accuse Gilbreath in 2008.

### 1. Uncalled witnesses

A lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005). In this instance,

both the circuit court and court of appeals concluded that trial counsel's decision not to call additional witnesses was a strategic decision made at trial, after counsel cross-examined S.L. successfully. This was an unreasonable conclusion that does not square with the record before the state courts.

Trial counsel's decision not to call additional witnesses, including Aaron Gilbreath, Kayla Faulds, and Giovanni Schimke, was made *before* trial. Trial counsel admitted at the postconviction hearing that he did not investigate the potential testimony of Aaron, Kayla, or Giovanni. Trial counsel did not file a witness list under Wis. Stat. § 971.23(2m)(a), identifying these family members, or anyone else, as witnesses that he intended to call. Counsel also did not arrange for these family members to be available and prepared to testify at trial. Counsel did not know that Aaron or Kayla could contradict S.L.'s testimony that she had revealed the sexual abuse to them before her 2008 disclosure, and counsel did not know that S.L.'s family members could testify that S.L. had a character for untruthfulness, because counsel did not interview these family members about the case. Therefore, the trial record does not support the state courts' conclusion that trial counsel made a strategic decision not to call additional witnesses based on counsel's opinion that cross-examination had gone well or that additional witnesses could have harmed Gilbreath's defense.

The state courts did not address trial counsel's failure to interview potential witnesses. But trial counsel's failure to investigate these witnesses raises red flags, as "[f]ew decisions not to present testimony can be considered 'strategic' before some investigation has taken place." *Best,* 426 F.3d at 946. *See also Mosley v. Atchison,* 689 F.3d 838, 848 (7th Cir. 2012) (not reasonable trial strategy to fail to call witnesses who were never even interviewed); *Rompilla v. Beard,* 545 U.S. 374, 387 (2005) ("It is the duty of the lawyer to conduct a prompt

investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (citation omitted).

In this instance, the record does not support a conclusion that trial counsel's failure to investigate Aaron's, Kayla's, and Giovanni's potential testimony was reasonable or strategic. Counsel knew that S.L. had reported to social services that she had told Aaron and Kayla about the assaults and that they had expressed support for her. Counsel also knew that Aaron and Giovanni shared a room with S.L. during half of the charging period. Counsel knew that the state had no physical evidence or witnesses to corroborate S.L.'s testimony regarding the assaults. The case against Gilbreath would essentially boil down to a credibility contest between Gilbreath and S.L., so any testimony that would undermine S.L.'s allegations or her credibility could be critical. But counsel failed to even investigate whether Aaron, Kayla, or Giovanni could have provided testimony to bolster Gilbreath's defense. In a felony case where the client potentially faces significant prison time, it falls below objective standards of reasonableness to fail to thoroughly investigate potential witnesses with such close connections to the events of the case.

At the postconviction hearing, Gilbreath's postconviction counsel questioned trial counsel about his reasons for not investigating and presenting testimony from potential witnesses. Trial counsel's purported reasons are not plausible. Counsel testified that he did not know what testimony Aaron, Kayla, or Giovanni could offer beyond what Haiden would testify to already. Dkt. 6-15, at 91, 96. But trial counsel could not reasonably reject Aaron, Kayla, and Giovanni as potential witnesses until he at least interviewed them to find out what their testimony would be. *See Blackmon v. Williams*, 823 F.3d 1088, 1104 (7th Cir. 2016) ("If counsel never learned what the witnesses would have said, he could not possibly have made a

reasonable professional judgment that their testimony would have been cumulative."). In addition, counsel knew that Haiden's testimony could be undermined by alleged statements she made to a social worker that she was "the lucky one" and that Gilbreath had kissed her "like a boyfriend." Counsel should have known that additional witnesses without impeachment problems could undermine S.L.'s credibility and bolster Gilbreath's defense more effectively than Haiden alone. *See Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) (finding counsel's failure to investigate and call additional witnesses was deficient due, in part, to the fact that the one alibi witness who was called had questionable credibility because of prior convictions); *Montgomery v. Petersen*, 846 F.2d 407, 411–15 (7th Cir. 1988) (finding counsel ineffective for not calling additional, disinterested alibi witnesses not subject to same impeachment as family members).

In sum, because trial counsel never found out what Aaron's, Kayla's, or Giovanni's testimony would be, counsel could not have made a reasonable professional judgment that their testimony would have been dangerous, bolstered the state's case, or added nothing of significance. His failure to do so was deficient performance. *See Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008) ("[C]ounsel could not have made a reasonable strategic decision not to call [potential witness] without interviewing him in order to evaluate his proposed testimony, his credibility or his demeanor.").

### 2.  Prior inconsistent statements

Gilbreath also argues that his lawyer should have presented prior statements by S.L. regarding the sexual abuse, her behavioral problems, and her relationships, that were inconsistent with her trial testimony. The court of appeals rejected this argument, concluding that trial counsel did not act deficiently in choosing to end his cross-examination after causing

21

S.L. to "kind of self-destruct." Dkt. 6-5, at 10, n.5. The court of appeals referred to the circuit court's observation that trial counsel effectively impeached S.L. regarding the false statements in the letter she wrote to her psychologist.

But the state courts' analyses are again based on an unreasonable determination of the facts. The record does not support a conclusion that counsel's failure to impeach S.L. with her prior inconsistent statements was a strategic decision based on how successful cross-examination had gone. Trial counsel admitted at the postconviction hearing that his failure to impeach S.L. regarding one of the inconsistencies between her 2008 and 2010 disclosures was an oversight, not a trial strategy. In particular, trial counsel testified that he thought the stipulation introduced at trial regarding the social worker's testimony included S.L.'s statements to the social worker that sexual touching had occurred five or six times, and only over S.L.'s clothing. Dkt. 6-15, at 62, 68–69. But the stipulation did not include that S.L. had told the social worker in 2008 that the touching had occurred only over her clothing. Counsel testified that he did not recall why he did not include that detail, and he offered no strategic reason why he did not, stating that that "it would've been better" if he had done so. *Id.* at 69. Counsel's error does not qualify as strategy. *See Carter v. Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) ("The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness.") (citation omitted).

Trial counsel's failure to impeach S.L. with other prior inconsistent statements also does not appear to be based on strategy. Both the circuit court and court of appeals stated that trial counsel decided reasonably to end cross-examination after successfully impeaching S.L. with the letter she wrote to her psychologist describing the sexual assaults. But that is not what happened at trial. The trial transcript shows that trial counsel did not stop his cross-

examination after questioning S.L. about the false statements in the letter she wrote to her psychologist. Dkt. 6-11, at 43. Counsel went on to question S.L. about her motives to falsely accuse Gilbreath. But counsel's questions regarding S.L.'s motives were ineffective because counsel failed to introduce any evidence to support his questions. For example, counsel asked S.L. if she had told the police that she had a great deal of "tension" with Gilbreath. *Id.* at 44. S.L. denied telling the police that there was tension, and counsel did not impeach S.L. with her statements to the contrary, or witnesses to those statements. *Id.* Counsel questioned S.L. about her boyfriend, asking her if she'd had a boyfriend who cut himself and whom Gilbreath disliked and restricted her from seeing. When S.L. testified that her boyfriend only cut himself before they were together and that Gilbreath did not have a problem with her boyfriend or restrict S.L. from seeing him, trial counsel did not impeach S.L. with her prior inconsistent statements to the police and social workers. *Id.* at 45. In particular, S.L. had told police and social workers that Gilbreath hated her boyfriend, that Gilbreath restricted her ability to see her boyfriend, that Gilbreath would not give her boyfriend a chance, and that Gilbreath blamed her boyfriend for S.L.'s cutting because her boyfriend also cut himself. Dkt 7-4, at 2; Dkt. 7-8, at 56.

Trial counsel also testified at the postconviction hearing that one of the reasons he decided not to impeach S.L. with prior inconsistent statements was because his single attempt to do so had been confusing and unsuccessful. Dkt. 6-15, at 66–67. But a review of the trial transcript shows that the reason the impeachment attempt was confusing and unsuccessful was because trial counsel attempted to impeach S.L. with a prior statement at a preliminary hearing that was *consistent* with her trial testimony.  Dkt. 6-11, at 23. Counsel's decision to abandon reliance on prior inconsistent statements because he failed to impeach S.L. properly does not qualify as a strategic decision.

23

Most of the prior inconsistent statements that trial counsel did not introduce at trial are relatively minor in isolation. For example, although S.L. denied telling social workers that she had a lot of tension with Gilbreath, S.L. testified during her direct examination that Gilbreath yelled at her a lot and made her feel uncomfortable. But I must consider the totality of the evidence that was presented and omitted. *See Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("[E]ven if individual acts or omissions are not so grievous as to merit a finding of incompetence or of prejudice from incompetence, their cumulative effect may be substantial enough to meet the *Strickland* test."). Some of S.L.'s prior inconsistent statements are significant. And because the case was a credibility contest from start to finish, reasonable trial counsel would have introduced the more significant inconsistent statements and the statements that would have undermined S.L.'s credibility. In particular, S.L.'s 2008 statement to a social worker and police officer that Gilbreath had touched her only over her clothes was dramatically different than her trial testimony describing the assaults. Trial counsel failed to confront this inconsistency with any evidence, even though that evidence was available.

Trial counsel also should have introduced S.L.'s prior statements about Gilbreath's treatment of her boyfriend, as these statements were important for Gilbreath's defense. Gilbreath's theory of defense was that S.L. was motivated to falsely accuse Gilbreath of sexual assault because he was a mean drunk and a harsh disciplinarian who prevented S.L. from seeing her boyfriend, whom she cared about significantly. But trial counsel let stand S.L.'s testimony that Gilbreath had no problem with her boyfriend. By asking S.L. questions about prior statements, and then failing to follow up with evidence, trial counsel let S.L.'s statements appear to be completely trustworthy. *See Moffett v. Kolb*, 930 F.2d 1156, 1161 (7th Cir. 1991)

24

(merely referencing an inconsistent statement is insufficient, because without evidence of the prior inconsistent statement, jury can accept trial testimony as completely trustworthy).

In sum, because the evidence of guilt was weak and because some of S.L.'s prior inconsistent statements were significant, trial counsel performed deficiently by failing to impeach S.L. with her prior inconsistent statements. *See Dixon v. Snyder*, 266 F.3d 693, 703–04 (7th Cir. 2002) (trial counsel found deficient for failing to cross-examine witness with pretrial statements, and deficiency was prejudicial in light of weak evidence of guilt); *Driscoll v. Delo*, 71 F.3d 701, 710–11 (8th Cir. 1995) (despite counsel's impeachment of key witness on other topics, failure to impeach with prior inconsistent statements known to counsel was both deficient and prejudicial).

### 3. Evidence of motive for 2008 disclosure

The third category of evidence that trial counsel failed to introduce was evidence to support a motive for S.L. to falsely accuse Gilbreath in 2008. Gilbreath argues that trial counsel should have introduced evidence that S.L. was dating an older boy in 2008, that Gilbreath did not approve of the relationship, and that Gilbreath would have put an end to the relationship had he been out of prison.

The state first argues that Gilbreath has procedurally defaulted this claim because he withdrew it at the postconviction hearing. Specifically, Gilbreath's postconviction counsel stated at the outset of the hearing that he was withdrawing several of Gilbreath's ineffective assistance theories, including counsel's failure to present evidence regarding S.L.'s motive to lie at the time of her initial disclosure in 2008. The state argues that because those claims were withdrawn, Gilbreath failed to exhaust them in state court and this court cannot consider them now. Gilbreath responds that his counsel misspoke at the postconviction hearing and did not

intend to withdraw his argument regarding evidence of a 2008 motive. He argues that the claim was fairly presented to the state courts and is not defaulted.

To preserve a claim for federal habeas review, a state prisoner must fairly present the operative facts and legal principles controlling the claim through a full round of state court review. *Mulero v. Thompson*, 668 F.3d 529, 536 (7th Cir. 2012). With ineffective-assistance claims, a petitioner procedurally defaults individual claimed deficiencies when he does not fairly present them to the state courts, even if he presented an ineffective-assistance claim based on other alleged errors. *Id.* In this instance, Gilbreath presented evidence at the postconviction hearing regarding S.L.'s motive to lie in 2008 and argued in briefs both in the circuit court and court of appeals that trial counsel's failure to present evidence to support a 2008 motive was ineffective assistance of counsel. Dkt. 7-9, at 16, 19–20; Dkt. 6-2, at 35; Dkt. 6-4, at 11–12; Dkt. 6-8, at 6–7, at 21–28. The court of appeals did not reject the theory as forfeited, and the court mentioned the 2008 evidence in its decision. Dkt. 6-5, at 6. Because the court of appeals resolved Gilbreath's claims on the merits and did not conclude that any claim was procedurally defaulted, the state's argument fails. *See Harris v. Reed*, 489 U.S. 255, 263 (1989) (claim is procedurally defaulted and barred from federal review if the last state court that rendered judgment clearly and expressly states that judgment rests on state procedural bar).

Turning to the merits, I agree with Gilbreath that trial counsel's failure to present evidence showing S.L.'s motive to accuse Gilbreath in 2008 was deficient. At trial, trial counsel focused on S.L.'s second disclosure of the sexual assaults in 2010, and the problems that S.L. was having with Gilbreath that prompted the 2010 disclosure. Trial counsel testified at the postconviction hearing that he knew Gilbreath had restricted S.L. from dating in 2008, and that counsel thought he had gotten that point across at trial. Dkt. 6-15, at 85–88. After

26

acknowledging that he might not have presented testimony about the 2008 boyfriend in particular, trial counsel testified that he thought it was sufficient to discuss S.L.'s motives for reporting Gilbreath in 2010. *Id.* at 85–87. But focusing on 2010 only was not a reasonable trial strategy. Even if the jury believed that S.L. was a difficult teenager who did not get along with Gilbreath in 2010, the jury knew that S.L. first disclosed the sexual assaults in 2008, when she was 14 years old and Gilbreath had been in prison for two years. Trial counsel offered no evidence showing that S.L. was going through a difficult time in 2008 or that she had any reason to falsely accuse Gilbreath at that time. It was not reasonable trial strategy to omit the only evidence of a possible motive for S.L.'s first disclosure in 2008. *See Blackmon*, 823 F.3d at 1104 (labeling a choice "strategic" does not automatically insulate it from collateral attack).

## C. Prejudice

Although I conclude that Gilbreath's trial counsel performed deficiently, that conclusion does not end the *Strickland* analysis. The Wisconsin Court of Appeals also concluded that Gilbreath did not suffer prejudice from his attorney's failure to call witnesses or present additional impeachment evidence. I must consider whether the court of appeals applied *Strickland* reasonably in concluding that Gilbreath had not shown prejudice. *See Carter*, 819 F.3d at 943 (even if counsel's performance was deficient for failing to interview potential witnesses, conviction must be upheld if state court's prejudice analysis was not unreasonable). So long as the state court's conclusion is "one of several equally plausible outcomes," I must allow the decision to stand. *Frentz v. Brown*, 876 F.3d 285, 295 (7th Cir. 2017).

The court of appeals correctly identified *Strickland* as the controlling legal authority. The court then concluded that Gilbreath was not prejudiced by counsel's failure to call witnesses or present additional evidence at trial because the proffered testimony and evidence

27

was "cumulative" to what had been presented already and would not have changed the outcome of the trial. Dkt. 6-5, at 10. In some cases, failure to present cumulative evidence is not prejudicial. *See, e.g., Morris v. United States*, 264 F.3d 726, 729 (7th Cir. 2001) (finding no prejudice where omitted testimony was cumulative). But in this case, the state court of appeals applied an unreasonably expansive definition of "cumulative" that is contrary to federal law.

The Wisconsin Court of Appeals defined "cumulative evidence" as "evidence of the same general character as was subject to proof at trial." Dkt. 6-5, at 8 (citing *State v. McAlister*, 2018 WI 34, ¶ 39, 380 Wis. 2d 684, 911 N.W.2d 7 (holding that additional evidence of the same general character or fact that was subject to proof at trial is cumulative and not a ground for a new trial)). The court of appeals determined that Gilbreath's proffered evidence was cumulative because it concerned subjects explored at trial already, including inconsistencies and omissions in S.L.'s 2008 statement and S.L.'s motives to falsely accuse Gilbreath. *Id.* at 9. The court concluded that because Gilbreath's evidence qualified as cumulative, and because counsel impeached S.L. on other topics, Gilbreath could not show prejudice.

But the state court's decision to apply Wisconsin's definition of cumulative evidence to Gilbreath's claim resulted in an unreasonable application of *Strickland*. Under federal law, "cumulative evidence" is evidence that "supports a fact established by existing evidence." *Washington*, 219 F.3d at 634. But evidence that supports previous testimony on a *contested* issue is not cumulative, it is corroborative. Thus, in *Washington*, a robbery case, the court held that evidence providing support to a witness's testimony about the defendant's location on the day of the robbery was not cumulative. *Id.* ("Washington's whereabouts on the day of the robbery was far from established—it was the issue in the case. The fact that [another witness] had

28

already testified to facts consistent with Washington's alibi did not render additional testimony cumulative.").

Most of the evidence that Gilbreath presented postconviction was corroborative, not cumulative. Some of the postconviction evidence concerned issues that were not discussed at all at trial, such as whether S.L. had a motive to falsely accuse Gilbreath in 2008, whether S.L. had actually told Aaron and Kayla about sexual assaults, whether Aaron or Giovanni witnessed anything suspicious between Gilbreath and S.L., and whether S.L.'s family thought that she was an untruthful person. The evidence that Gilbreath presented at the postconviction hearing on these subjects was not cumulative of any other evidence presented at trial.

Much of the postconviction evidence concerns S.L.'s credibility, which was not something that was "established by existing evidence." S.L.'s credibility was the central contested issue at trial. Gilbreath's postconviction evidence regarding S.L.'s prior inconsistent statements describing the sexual assaults, regarding Gilbreath's interference with S.L.'s romantic relationships, and regarding S.L.'s behavioral problems went to this central contested issue, and was not cumulative.  If the jury had heard this evidence, it could have concluded that S.L. was untrustworthy, and the jury could have doubted all her testimony.

The state appellate court did not adequately consider the effect of counsel's failure to introduce additional evidence. It was not enough under *Strickland* to conclude that omitted evidence is cumulative and therefore, not prejudicial. "In weighing the effect of counsel's errors, the court must consider the totality of the evidence before the judge or jury." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001). A verdict that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record. *Id. See also Strickland*, 466 U.S. at 696. Thus, in evaluating prejudice, courts must assess

29

the strength or weakness of the state's case. *Blackmon*, 823 F.3d at 1106 ("We begin [the prejudice assessment] with the weakness of the State's case.").

The state appellate court did not discuss the strength of state's case against Gilbreath beyond referring to the circuit court's statement that the state had a "weak case." Dkt. 6-5, at 8. But the court included no discussion of how the weakness of the state's case affected its prejudice analysis. This error rendered the state court's opinion unreasonable. In applying *Strickland*, it is essential to consider the strength of the state's case because, to establish prejudice, Gilbreath has to show only a reasonable chance that counsel's errors altered the outcome of the case. Gilbreath does not have to prove that he was innocent, and he does not even have to show that he likely would have been acquitted if his counsel had introduced additional evidence. *See Blackmon*, 823 F.3d at 1107 ("[T]o establish prejudice, [petitioner] does not have to prove actual innocence; he does not even have to show that counsel's errors more likely than not altered the outcome in his case."); *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006) ( "For the issue is not whether [petitioner] is innocent, but whether if he had had a competent lawyer he would have had a reasonable chance (it needn't be a 50 percent or greater chance) of being acquitted."). Because the state court failed to consider the effect of counsel's errors in light of the totality of evidence presented, I must do so here to properly evaluate Gilbreath's habeas petition.

The state argues now that the case against Gilbreath was stronger than Gilbreath and the state courts suggest, and that even with additional evidence, Gilbreath had no reasonable chance of acquittal. The state points to Gilbreath's history as an alcoholic, Haiden's alleged statements to a social worker that Gilbreath kissed her like a "boyfriend" and that she was the "lucky one," and the family's treatment of S.L. after her second disclosure in 2010. The state

30

argues that a jury likely would have thought Gilbreath's additional evidence was weak, because the family was biased against S.L. and S.L.'s inconsistencies could be explained by her trauma and the passage of time. The state is correct that prosecution would have arguments to make against Gilbreath's additional evidence. But that is not sufficient to show that Gilbreath was not prejudiced by his counsel's errors.

The prosecutor could have cross-examined Aaron, Giovanni, and Kayla about biases or motives to lie, and the prosecutor could have argued that S.L.'s inconsistent statements were a result of S.L.'s traumatic experiences. The prosecutor also could have argued that Gilbreath's evidence regarding S.L.'s motive to lie in 2008 was weak. But the cumulative effect of counsel's many errors caused Gilbreath prejudice. *See Earls v. McCaughtry*, 379 F.3d 489, 495–96 (7th Cir. 2004) ("[W]here, like here, the defense attorney made multiple errors as opposed to a single error, the cumulative effect of those errors should be considered together to determine the possibility of prejudice."); *Hough*, 272 F.3d at 891 ("We previously have pointed out that prejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient.").

S.L.'s credibility was damaged at trial by her testimony about the letter she wrote to her psychologist. But the prosecutor was able to rehabilitate S.L., at least in part, by asking her whether the letter to her psychologist was intended to be an emotional outlet, rather than a factual account. If Gilbreath's trial counsel had introduced all of the evidence presented postconviction, S.L.'s credibility would have been more significantly undermined, and the prosecutor would have had a more challenging job rehabilitating S.L.'s credibility. If the jury had heard details about how S.L.'s 2008 account of the sexual assaults differed from her 2010

account, about how S.L. had motive to accuse Gilbreath and behavioral problems both in 2008 and in 2010, and that multiple family members thought S.L. was dishonest and had lied about disclosing sexual assaults to them, there is a reasonably possibility that Gilbreath would have been acquitted. *See Raether v. Meisner*, 608 Fed. Appx. 409 (7th Cir. 2015) (holding that defendant was prejudiced by counsel's failure to impeach victim and victim's friend with prior statements).

In sum, because the state's case (and petitioner's defense) relied entirely on witness credibility, there is a reasonable probability that counsel's failure to challenge S.L.'s credibility in important ways affected the outcome of the case. Gilbreath's trial did not reliably test whether he did as he was accused, and the state appellate court's decision to the contrary is an unreasonable application of *Strickland*. Therefore, I will grant Gilbreath's petition for a writ of habeas corpus, and I will direct respondent to release petitioner within 120 days unless the state elects to retry petitioner before then. *Owens v. Duncan*, 781 F.3d 360, 366 (7th Cir. 2015) (giving state 120 days to release or retry petitioner after awarding habeas relief); *Ray v. Clements*, 700 F.3d 993, 1018 (7th Cir. 2012) (same).

ORDER

IT IS ORDERED that:

1.  Petitioner Michael Gilbreath's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is GRANTED.

2. The State of Wisconsin has 120 days to either release Gilbreath or initiate proceedings to retry him.

Entered August 4, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge